# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TERESA L. MORANGELLO,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00038 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

Plaintiff, Teresa L. Morangello, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings

Case 2:07-cv-00038-PMS   Document 18   Filed 04/01/08   Page 1 of 26   Pageid#: 101

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Morangello protectively filed her applications for SSI and DIB on or about July 22, 2005, alleging disability as of January 1, 2000, based on mitral valve prolapse, left ear hearing loss, depression, anxiety, problems with the right knee, severe back pain and breathing difficulty.[1] (Record, ("R."), at 55-57, 60, 61, 81.) The claims were denied initially and on reconsideration. (R. at 43-45, 46, 49-51.) Morangello then requested a hearing before an administrative law judge, ("ALJ"). (R. at 12.) The ALJ held a hearing on December 21, 2006, at which Morangello was represented by counsel. (R. at 301-18.)

By decision dated January 31, 2007, the ALJ denied Morangello's claims. (R. at 16-23.) The ALJ found that Morangello met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2003. (R. at 22.) The ALJ found that Morangello had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ found that the medical evidence

---

[1]Morangello's SSI application is not contained in the record on appeal.

-2-

established that Morangello had severe impairments, namely right knee pain status post arthroscopic knee surgery, asthma, a depressive disorder and an anxiety disorder, but he found that Morangello's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19, 22.) The ALJ found that Morangello's allegations regarding her limitations were not totally credible. (R. at 22.) The ALJ also found that Morangello retained the functional capacity to perform simple, low-stress light[2] work that did not require working with the public or exposure to respiratory irritants. (R. at 23.) Thus, the ALJ found that Morangello could not perform her past relevant work. (R. at 23.) Based on Morangello's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Morangello could perform jobs existing in significant numbers in the national economy, including those of a stock clerk, a hand packager, a sorter, an assembler and an inspector. (R. at 23.) Therefore, the ALJ found that Morangello was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

After the ALJ issued his decision, Morangello pursued her administrative appeals, (R. at 296-300), but the Appeals Council denied her request for review. (R. at 6-9.) Morangello then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). The case is before this court on Morangello's motion for summary judgment filed December 20, 2007, and on the Commissioner's motion for

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

summary judgment filed February 20, 2008.

## II. Facts[3]

Morangello was born in 1969, (R. at 55), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education with two years of college instruction, as well as a certificate in paralegal studies.[4] (R. at 66, 304-05.) Morangello has past work experience as a deli cook and assistant manager for a fast food pizza restaurant. (R. at 62, 110, 305.)

Morangello testified that her job in the pizza restaurant required her to frequently lift bags of flour. (R. at 305.) She testified that lifting also was required in her deli cook job. (R. at 306.) Morangello testified that she was unable to work due to her knee giving way, depression, loss of hearing in the left ear, back pain, panic attacks and anxiety and asthma. (R. at 306.) Morangello testified that she was seeing physicians at Stone Mountain Health Services, for both her physical and mental impairments. (R. at 306.) She stated that she had been seeing a counselor for approximately a year and a half for depression and anxiety. (R. at 306.) Morangello testified that she took medications for her conditions, which helped "some." (R. at

_____

[3]The relevant time period to this court's decision regarding Morangello's DIB claim is January 1, 2000, Morangello's alleged onset date, through December 31, 2003, the date through which Morangello remained insured for DIB purposes. However, the court must consider all of the evidence from Morangello's alleged onset date through January 31, 2007, the date of the ALJ's decision, in deciding whether substantial evidence supports the ALJ's denial of her SSI claim. Any medical information pertaining to any time period other than these is included only for clarity of the record.

[4]In a Disability Report, Morangello indicated that she had two years of college instruction. (R. at 66.) However, at her hearing, she testified that she attended college for "maybe one semester." (R. at 304.)

-4-

307.)

Morangello testified that she was unable to sit for long periods of time, noting that she had to constantly move to alleviate her back pain. (R. at 307.) In regards to her right knee, she stated that she had good days and bad days, noting that it would work fine at times, but would "lock up" at others. (R. at 307.) She testified that her knee gave way approximately twice monthly, causing her to fall. (R. at 307-08.) She stated that she wore a knee brace when she had to walk or be on her feet a lot. (R. at 307-08.) Morangello testified that she had difficulty carrying and lifting objects, noting that she could carry a gallon of milk or a sack of potatoes. (R. at 308.) She stated that she could reach overhead, but with pain. (R. at 308.) Morangello testified that she could kneel on her knees for up to 30 minutes. (R. at 308.) She stated that she could perform household chores such as cleaning and dusting, washing dishes and cooking, but that it took her all day to complete such chores because she had to take a lot of breaks. (R. at 310.) She further stated that performing such chores would leave her feeling "rough" the next day. (R. at 310.) Morangello stated that she cleaned her house approximately twice weekly. (R. at 311.) She stated that she did not drive long distances and that she had difficulty sleeping. (R. at 308-09.) She testified that driving aggravated her knee. (R. at 313.) Morangello stated that she had to lie down up to three times daily for up to 40 minutes each time. (R. at 309.)

Morangello testified that she experienced two to three panic attacks weekly. (R. at 309.) She further testified that she did not go around crowds of people, indicating that she would shop early in the morning or late at night. (R. at 309-10.) Morangello stated that she had difficulty concentrating and intermittent memory difficulty. (R. at 310.) She stated that she did not socialize much and did not belong

Case 2:07-cv-00038-PMS   Document 18   Filed 04/01/08   Page 5 of 26   Pageid#: 105

to any clubs, but that she attended church services "every once in a while." (R. at 311, 314.) Morangello testified that she visited friends up to three times monthly. (R. at 311.) She stated that she attended sporting events in the past, but no longer did so. (R. at 311.)

Morangello testified that she lost the hearing in her left ear approximately four years earlier as a result of being placed on antibiotics for two months after being diagnosed with "tick fever." (R. at 311.) She stated that she had inquired into obtaining a hearing aid, but that she was informed that a hearing aid would not help her. (R. at 312.) Morangello testified that she had to maintain eye contact and slant her right ear toward an individual speaking in order to hear normal conversation. (R. at 312.) She further stated that she suffered from asthma and did not smoke. (R. at 314.)

Donna Bardsley, a vocational expert, also was present and testified at Morangello's hearing. (R. at 315-17.) Bardsley classified Morangello's past work as a deli cook as medium[5] and semiskilled and her work as an assistant manager as medium and skilled. (R. at 315.) Bardsley was asked to assume a hypothetical individual of Morangello's age, education and work history who could perform light work, but who could not be exposed to excessive dust, fumes, chemicals and temperature extremes. (R. at 315-16.) Bardsley testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a stock and inventory clerk, a hand packager, a sorter, an assembler and an

---

[5]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2007).

inspector. (R. at 316.) Bardsley was then asked to consider the same hypothetical individual, but with the restrictions imposed by psychologist Spangler. (R. at 316.) Bardsley testified that such an individual could not perform the enumerated jobs. (R. at 316-17.) Lastly, Bardsley was asked to consider the first hypothetical with the added limitation of hearing in only one ear. (R. at 317.) Bardsley testified that the individual could perform the enumerated jobs. (R. at 317.) Morangello's counsel presented no hypothetical questions to the vocational expert.

In rendering his decision, the ALJ reviewed records from Lee County Schools; Lonesome Pine Hospital; Holston Valley Hospital; Dr. Elizabeth Cooperstein, M.D.; Dr. Hossein Faiz, M.D.; Dr. S.C. Kotay, M.D.; Norton Community Hospital; Stone Mountain Health Services; Dr. Lawrence J. Fleenor, M.D.; Lee Regional Medical Center; Julie Jennings, Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. L. Del Bailey Jr., M.D.; Sullivan Digestive Center; D. Kaye Weitzman, L.C.S.W.; and Robert S. Spangler, Ed.D., a licensed psychologist.

On April 27, 2000, an MRI of Morangello's brain showed no intracranial abnormality and a normal appearance of the orbits bilaterally. (R. at 129-30.) Morangello presented to the emergency department at Lonesome Pine Hospital on February 2, 2001, with complaints of right knee pain. (R. at 118.) X-rays revealed no significant abnormalities. (R. at 120.) She was diagnosed with a sprain of the right knee and was prescribed Anaprox. (R. at 118-19.) On February 9, 2001, Morangello saw Dr. Elizabeth Cooperstein, M.D., with complaints of right knee pain after twisting the knee approximately two weeks previously. (R. at 132.) Dr. Cooperstein noted

-7-

that the right knee was stable with no crepitus, effusion, erythema or edema. (R. at 132.) She diagnosed Morangello with right knee pain/medial collateral ligament strain and prescribed Vioxx and physical therapy. (R. at 132.) In a letter dated June 11, 2001, Dr. Hossein Faiz, M.D., stated that he had evaluated Morangello's recurrent right patellar subluxation for the possibility of right patelloplasty. (R. at 134.) Dr. Faiz noted that x-rays of the right knee were normal. (R. at 134.) By letter dated June 26, 2001, Dr. S.C. Kotay, M.D., an orthopedic surgeon, informed Dr. Faiz that Morangello had been experiencing very severe dislocation of the right knee for the previous two years.[6] (R. at 138.) He noted that Morangello had a mildly increased quadriceps angle, but x-rays showed that the patella was not elevated, and the patellar groove appeared to be well-formed. (R. at 138.) Dr. Kotay opined that Morangello's dislocations were most probably related to the increased quadriceps angle and weakness of the medial parapatellar structures. (R. at 138.) He further opined that this would require surgical repair for stabilization. (R. at 138.) Dr. Kotay stated that he had discussed this with Morangello and that she likely would continue to have patellofemoral pain secondary to chondromalacia that would not be corrected by the surgery. (R. at 138.)

Morangello underwent arthroscopic surgery on the right knee on August 15, 2001. (R. at 143-47.) Following surgery, Dr. Kotay noted no evidence of recurrent subluxation and that the patella appeared stable. (R. at 144.) Surgery revealed that the anterior horn of the medial meniscus had quite a bit of fraying, and there was a large subtotal articular cartilage lesion measuring 1 to 1.5 centimeter, which Dr. Kotay

---

[6]Dr. Kotay noted that Morangello had experienced such recurrent dislocation for approximately 20 years, beginning at age 14. (R. at 138.) He stated that it had stopped as Morangello had gotten older, only to reappear in the prior two years. (R. at 138.)

-8-

opined was causing Morangello's symptoms. (R. at 144.) A treatment note from Dr. Kotay, dated August 20, 2001, indicated that Morangello was doing well following surgery. (R. at 137.)

On September 4, 2001, Morangello complained to Dr. Kotay that her knee had "caught" while sitting down during the weekend. (R. at 135.) She stated that she could not kneel on the right knee. (R. at 135.) Dr. Kotay noted clinically normal knee motion with no effusion, but he did note some mild popping under the kneecap. (R. at 135.) He advised Morangello to follow up in three weeks. (R. at 135.) Morangello presented to the emergency department on October 6, 2001, with complaints of right knee pain. (R. at 116.) She was diagnosed with post-operative knee pain, was prescribed Naprosyn and was advised to follow up with Dr. Kotay. (R. at 117.) Morangello saw Dr. Abdul-Latief Almatari, M.D., at Stone Mountain Health Services, ("Stone Mountain"), on December 31, 2001, to follow up after her emergency room visit. (R. at 181-82.) She stated that she had right knee pain with walking and that she occasionally lost her balance due to popping of the patella. (R. at 182.) She complained of occasional dizziness and some chest pain at times. (R. at 182.) A physical examination revealed some tenderness of the right knee. (R. at 182.) Dr. Almatari noted a bruise on the right knee, which was slightly swollen without effusions. (R. at 182.) Morangello was diagnosed with post-operative knee pain and was prescribed Vioxx and Lortab. (R. at 181.) She was advised to follow up with Dr. Kotay. (R. at 181.)

Morangello presented to Dr. Lawrence J. Fleenor, M.D., on May 13, 2002, with complaints of a nodular rash over her body, especially on her palms and soles, for the previous three weeks. (R. at 203.) Dr. Fleenor suspected Rocky Mountain spotted

-9-

fever and prescribed medication. (R. at 203.) On May 22, 2002, Morangello called Dr. Fleenor with complaints of worsening symptoms, including photophobia and headache. (R. at 202.) She was advised to inform the health department of probable Rocky Mountain spotted fever. (R. at 202.)

Morangello presented to Stone Mountain on December 30, 2003, after hitting her left thumb with a hammer the previous day. (R. at 180.) She relayed significant pain and decreased sensation in the left thumb. (R. at 180.) Morangello also stated that she was anxious, noting that she had taken anti-anxiety medication in the past, but was not then-currently taking any such medication. (R. at 180.) She stated that her arms, abdomen and chest itched when she became anxious, resulting in small lesions. (R. at 180.) She attributed her anxiety to her three children being out of school. (R. at 180.) X-rays of the left hand and left thumb revealed no acute fracture. (R. at 195.) Morangello was given Motrin for pain and was diagnosed with prurigo nodularis,[7] likely caused by anxiety. (R. at 180.) Dr. Deepti S. Kudyadi, M.D., prescribed Vistaril. (R. at 180.) On May 22, 2004, Morangello presented to the emergency department after stepping on a rusty wire. (R. at 212.) A puncture wound was noted on the left foot, which was slightly red. (R. at 211-12.) She was diagnosed with a puncture wound of the left foot and was advised to elevate the foot and rest. (R. at 208.) Morangello was prescribed Cipro and Ultram. (R. at 208.) On May 24, 2004, Morangello saw Dr. Fleenor with the same complaints. (R. at 202, 214-17.) She informed Dr. Fleenor that she had not gotten the Cipro prescription filled for financial

---

[7]Prurigo nodularis is a chronic, intensely pruritic form of neurodermatitis, usually occurring in women, located chiefly on the extremities, especially on the anterior thighs and legs and characterized by the presence of single or multiple, pea-sized or larger, firm, and erythematous or brownish nodules that become verrucous or fissured. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1375-76 (27th ed. 1988).

reasons. (R. at 216.) She took a Z-pack belonging to her mother, but her symptoms continued to worsen. (R. at 216.) Morangello stated that she had experienced sweating, shaking chills, sensation of fever and increasing painful swelling of the lateral left foot. (R. at 216.) She was diagnosed with cellulitis and septicemia and was admitted to the hospital for blood cultures, intravenous antibiotics and a Tetanus booster. (R. at 202, 216.) Dr. Fleenor noted that Morangello's hospital course was one of steady improvement. (R. at 215.) She was prescribed a medication that she could afford and was discharged on May 27, 2004, in ambulatory condition. (R. at 214-15.)

On January 11, 2005, Morangello presented to the emergency department at Holston Valley Medical Center with complaints of pain after twisting her right knee. (R. at 222.) She noted that it "popped," and there was bruising. (R. at 222.) Morangello had a small patellar effusion without warmth, but bruising and lateral knee tenderness with any palpation. (R. at 222.) X-rays of the right knee showed no acute osseous pathology. (R. at 224.) She was diagnosed with internal knee derangement, was given a knee immobilizer and was prescribed Lortab. (R. at 222.) On February 3, 2005, Morangello saw Dr. Laurent J. Legault, M.D., for an evaluation of her knee pain. (R. at 225.) She noted increased pain since the arthroscopic surgery. (R. at 225.) She informed Dr. Legault that her knee had given out the previous month and that she had experienced ongoing problems since that time. (R. at 225.) Dr. Legault noted that Morangello was "relatively healthy otherwise." (R. at 225.) An examination of Morangello's right knee showed increased quadriceps angle, tenderness along the lateral aspect of the patella and mild tenderness medially. (R. at 225.) The cruciate ligaments were intact, and she had a good range of motion. (R. at 225.) Dr. Legault opted to treat Morangello conservatively, simply allowing the

-11-

episode to "settle down." (R. at 225.) Morangello presented to the emergency department at Lee Regional Medical Center on June 20, 2005, with complaints of severe left ankle pain after becoming entangled in a dog chain causing her to fall down. (R. at 226-34.) She rated her pain as a 10 on a 10-point scale, with 10 being the worst pain ever. (R. at 230.) A small superficial laceration to the left ankle was noted. (R. at 230.) A dressing was applied to the wound, and Morangello was discharged with crutches. (R. at 230, 234.)

Morangello again saw Dr. Kudyadi on July 18, 2005, with complaints of chest wall pain, especially with panic attacks. (R. at 178.) She stated that she had experienced these symptoms for the previous nine years, and had been hospitalized a few years previously for chest pain. (R. at 178.) Morangello noted a prior negative stress test. (R. at 178.) She stated that these episodes abated within approximately 10 minutes of lying down. (R. at 178.) Morangello stated that she had never seen a psychiatrist, but was willing to see a counselor. (R. at 178.) A physical examination revealed deep tendon reflexes that were 2+ and symmetric, full strength in the upper and lower extremities, a normal gait and no tremors of the outstretched hands. (R. at 178.) Dr. Kudyadi diagnosed chest wall pain and generalized anxiety and panic disorder. (R. at 178.) He prescribed Lexapro and scheduled her to see a counselor. (R. at 178.)

Morangello saw D. Kaye Weitzman, a licensed clinical social worker, on July 26, 2005, for a mental evaluation. (R. at 275-76.) Morangello had an anxious mood, but a normal affect. (R. at 276.) She exhibited short-term memory problems, but no abnormality of thought, no suicidal or homicidal ideations and no psychosis. (R. at 276.) Weitzman diagnosed panic disorder without agoraphobia and a Global

-12-

Assessment of Functioning, ("GAF"), score of 70.[8]  (R. at 276.)  She recommended a trial of Buspar to decrease Morangello's panic symptoms.  (R. at 276.)

Morangello presented to the emergency department at Lonesome Pine Hospital on August 10, 2005, with complaints of chest pain with dyspnea.  (R. at 235.)  A chest x-ray showed no acute cardiopulmonary abnormalities.  (R. at 243.)  She was diagnosed with mitral valve prolapse exacerbation and stress reaction and was prescribed alprazolam.  (R. at 235-36.)  On August 17, 2005, Morangello complained of chest tightness with shortness of breath and palpitations, which she had experienced for the previous several years and which "waxed and waned."  (R. at 174.)  She reported having presented to the emergency department earlier that week, and noted that Xanax helped her symptoms.  (R. at 174.)  Dr. Kudyadi noted that pain was reproducible at the left side costochondral junction of the fourth rib.  (R. at 174.)  Deep tendon reflexes were 2+ and symmetric, strength of the upper and lower extremities was full and Morangello's gait was normal.  (R. at 174.)  An EKG showed normal sinus rhythm with normal axis.  (R. at 174.)  Dr. Kudyadi diagnosed atypical chest pain that sounded pleuritic and insomnia.  (R. at 174-75.)  He prescribed Motrin, prednisone and Flexeril.  (R. at 174.)

On August 26, 2005, Morangello again saw Dr. Fleenor with complaints of difficulty breathing.  (R. at 201.)  She was diagnosed with agoraphobia and panic

---

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health–illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF score of 61 to 70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning, but [the individual is] generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

disorder, and her dosage of Lexapro was increased. (R. at 201.) On August 29, 2005, Morangello complained of persistent dyspnea and tightness in her chest, which Albuterol was not helping. (R. at 172.) Teresa Ellis, a family nurse practitioner with Stone Mountain, noted that Morangello had a history of anxiety and asthma, but had no such symptoms for "quite some time." (R. at 172.) Morangello was advised to increase her Lexapro. (R. at 172.) She also was given a short-term prescription for Xanax, which helped her panic attacks, but not her shortness of breath. (R. at 172.) She reported no pleuritic chest pain. (R. at 172.) Ellis noted that Morangello had 99 percent oxygen saturation on room air and a regular rate and rhythm of the heart. (R. at 172.) Ellis further noted that Morangello appeared anxious. (R. at 172.) She was diagnosed with dyspnea with a known history of asthma and anxiety and was prescribed Advair and Singulair. (R. at 172.)

Morangello saw Weitzman again on September 6, 2005, with complaints of decreased sleep, increased anxiety and fatigue. (R. at 274.) Weitzman noted some irritability, but no obvious depression. (R. at 274.) She further noted that Morangello had an anxious mood and affect. (R. at 274.) She was prescribed Buspar per Dr. Kudyadi's order. (R. at 274.) On September 9, 2005, a physical examination revealed no redness, warmth or swelling of the right knee, but some minimal crepitus. (R. at 169.) She also complained of back pain with occasional "giving out." (R. at 169.) Ellis noted some tenderness of the spinous rectors in the midback area, but a full range of motion with much guarding and grimacing with position changes. (R. at 169.) Ellis opined that Morangello had an exaggerated response to light touch over the spinous rector muscles. (R. at 169.) She was diagnosed with chronic knee pain and chronic back pain, was given a Solu-Medrol injection for swelling and was advised to continue taking ibuprofen. (R. at 169.) On September 12, 2005, Morangello again

-14-

saw Ellis with complaints of myalgias all over her body. (R. at 166.) A physical examination revealed tenderness of the anterior thighs and multiple trigger points of the upper torso. (R. at 166.) Ellis diagnosed myalgias of an unclear etiology. (R. at 166.) Morangello was prescribed hydrocodone. (R. at 166.)

On September 12, 2005, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Morangello had no medically determinable impairment as of the date last insured for DIB purposes, and only nonsevere impairments thereafter, for SSI purposes. (R. at 245-57.) In particular, Jennings opined that Morangello had a nonsevere affective disorder and a nonsevere anxiety-related disorder. (R. at 245.) She found that Morangello was only mildly restricted in her activities of daily living, experienced only mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation. (R. at 255.) E. Hugh Tenison, Ph.D., another state agency psychologist, affirmed these findings on January 23, 2006. (R. at 245.) Also on September 12, 2005, Dr. Frank M. Johnson, M.D., a state agency physician, completed a physical residual functional capacity assessment, indicating that, as of the date last insured for DIB purposes, Morangello could perform medium work. (R. at 258-64.) He concluded that she could frequently use ramps and climb stairs, occasionally climb ladders, but never climb ropes or scaffolds. (R. at 260.) He further found that Morangello could frequently balance and stoop and occasionally kneel, crouch and crawl. (R. at 260.) Dr. Johnson imposed no manipulative, visual or communicative limitations. (R. at 260-61.) He opined that she should avoid even moderate exposure to hazards such as heights and machinery. (R. at 261.) Morangello's subjective allegations were found to be not credible. (R. at 263.) These

-15-

findings were affirmed by Dr. Michael J. Hartman, M.D., another state agency physician, on January 23, 2006. (R. at 262.)

Morangello underwent spirometry testing on September 15, 2005, which revealed only a mild restriction. (R. at 191.) On September 19, 2005, Morangello complained of shortness of breath and anxiety. (R. at 164.) She noted that Xanax helped her symptoms "tremendously" and that she did not find Lexapro to be very helpful. (R. at 164.) Ellis noted that Morangello appeared "quite anxious." (R. at 164.) She further noted that Morangello had an exaggerated response to light touch in the anterior chest wall and posterior areas with light touch of the stethoscope. (R. at 164.) No gross bony deformity was noted, and her chest was clear in all fields. (R. at 164.) Ellis noted that Morangello appeared to hyperventilate at times during the exam. (R. at 164.) Ellis diagnosed Morangello with shortness of breath and an anxiety disorder. (R. at 164.) She was advised to discontinue Lexapro, which could be exacerbating her anxiety symptoms, and she was prescribed Doxepin. (R. at 164.) On September 21, 2005, Morangello saw Dr. Kudyadi with complaints of continued choking sensation, making it difficult to breathe. (R. at 161.) She also complained of pain between the shoulder blades. (R. at 161.) Dr. Kudyadi noted that Morangello was in no respiratory distress. (R. at 161.) Her deep tendon reflexes were 2+ and symmetric. (R. at 161.) She had tender points with evidence of fullness to the right of the thoracic spine between the shoulder blades with muscle spasm. (R. at 161.) Dr. Kudyadi diagnosed a choking sensation with dysphagia[9] and occasional odynophagia.[10] (R. at 161.) He referred her to Dr. Sullivan for evaluation of a

---

[9]Dysphagia is the difficulty swallowing. *See* Dorland's at 519.

[10]Odynophagia is pain with swallowing. *See* Dorland's at 440, 1168.

possible Zenker's diverticulum.[11]  (R. at 161.)  He also diagnosed thoracic muscle spasm with tender points, and he administered a trigger point injection, which resulted in relief. (R. at 161.)  Dr. Kudyadi also diagnosed atypical chest pain, and Morangello agreed to another stress test.  (R. at 160.)

On September 29, 2005, Morangello presented to Dr. Kudyadi with continued complaints of pain between the shoulder blades. (R. at 158.)  She denied numbness of the hands or feet, bowel or bladder problems.  (R. at 158.)  Dr. Kudyadi noted that Morangello was playing a game when he entered the exam room, but upon his entrance, she complained of pain between the shoulder blades and was almost "withering in pain." (R. at 158.)  She denied any dysuria, cough, shortness of breath or any pleuritic chest pain, fever or chills.  (R. at 158.)  Morangello was in no respiratory distress.  (R. at 158.)  Dr. Kudyadi noted continued fullness to the right of the thoracic spine between the shoulder blades, but the muscle spasm had improved and the entire area between the shoulder blades on the right side was tender to palpation.  (R. at 158.)  Morangello was diagnosed with thoracic muscle spasm with persistent tender points.  (R. at 158.)  Dr. Kudyadi noted that he had hesitantly dispensed Lortab.  (R. at 158.)  Morangello declined a trigger point injection.  (R. at 158.)  On October 6, 2005, Morangello underwent a stress test after complaints of shortness of breath, chest pain and back pain, which yielded normal results.  (R. at 189.)  Dr. Gerald G. Blackwell, M.D., noted no evidence of inducible ischemia or prior myocardial infarction.  (R. at 189.)  Morangello exhibited a resting left ventricular ejection fraction of 72 percent. (R. at 189.)  An MRI of the thoracic spine, taken on October 10, 2005, showed no discrete abnormality.  (R. at 185.)

---

[11]Zenker's diverticulum is a pouch or sac of variable size of the pharyngoesophagus.  *See* Dorland's at 502-03.

Morangello saw Dr. L. Del Bailey Jr., M.D., on October 12, 2005, at Dr. Kudyadi's referral for evaluation of dysphagia of two months' duration. (R. at 266-67.) Dr. Bailey noted that Morangello's symptoms had some elements of globus,[12] as well as of dysphagia. (R. at 266.) He opined that she had a ring or an esophageal stricture, and he scheduled her for an upper endoscopy with dilation. (R. at 266.) A chest x-ray showed a normal-sized heart, clear lungs and mild dorsal scoliosis. (R. at 190.) Morangello underwent the upper endoscopy and dilation on October 20, 2005, which revealed reflux esophagitis and glandular mucosa. (R. at 271.)

On October 21, 2005, Morangello saw Dr. Kudyadi to discuss the results of her stress test and MRI of the thoracic spine, which showed no abnormalities. (R. at 155.) The previous trigger point injection had helped Morangello's thoracic spinal pain for only a few days, and she declined another injection. (R. at 155.) She stated that she took Motrin unless the pain was extremely severe, in which case she used Lortab. (R. at 155.) Morangello was in no respiratory distress, but she continued to show tenderness between the shoulder blades on the side of the thoracic spine. (R. at 155.) Dr. Kudyadi diagnosed persistent trigger point with thoracic muscle spasm. (R. at 155.) He noted that Morangello took muscle relaxants and pain medication with good results. (R. at 155.) Dr. Kudyadi further diagnosed a choking sensation with dysphagia. (R. at 155.) On January 4, 2006, Morangello again saw Dr. Kudyadi with complaints of continued occasional pain between the shoulder blades. (R. at 152.) However, she attributed this to "running around" with her kids during the holiday season. (R. at 152.) She stated that Advair helped her breathing. (R. at 152.) Morangello was in no respiratory distress. (R. at 152.) Dr. Kudyadi diagnosed mild

_____

[12]Globus hystericus is the disturbing subjective sensation of a lump in the throat. It is seen in hysteria. *See* Dorland's at 700.

-18-

restriction on pulmonary function testing and thoracic strain. (R. at 152.) Dr. Kudyadi noted that Morangello could not afford to see a pulmonologist, and she declined a referral to an orthopedist. (R. at 152.) On March 29, 2006, Morangello informed Dr. Kudyadi that black mold had been discovered in her home, and that she was having increased allergy symptoms. (R. at 149.) She was diagnosed with allergic rhinitis with acute pharyngitis. (R. at 149.) Dr. Kudyadi dispensed samples of Avelox and Norel LA. (R. at 149.) On March 31, 2006, Morangello called in to Stone Mountain stating that she did not feel any better and requested prednisone, which was prescribed. (R. at 148.)

Morangello saw Dr. Paul Augustine, M.D., with Stone Mountain, on June 22, 2006, with complaints of acute left shoulder pain with no associated injury. (R. at 283.) A physical examination revealed costovertebral tenderness in the left supraclavicular area, and Morangello had pain on movement of the left upper extremity. (R. at 283.) Dr. Augustine diagnosed acute muscle sprain versus arthritis or bursitis of the left shoulder. (R. at 283.) She was treated with a Toradol injection and was sent for an x-ray of the left shoulder. (R. at 283.) Dr. Augustine prescribed Flexeril and advised Morangello to use an arm sling and nonsteroidal over-the-counter medication as needed for pain, as well as a heating pad with analgesic ointments. (R. at 283.) X-rays revealed no significant bony or soft tissue abnormality. (R. at 285.) Morangello saw Lisa Deeds, a family nurse practitioner at Stone Mountain, on September 29, 2006, with complaints of increased back pain for the previous two weeks without any precipitating incidents. (R. at 281.) She stated that she was taking Tylenol without significant relief and was out of muscle relaxers. (R. at 281.) Deeds noted that Morangello was in a moderate amount of discomfort. (R. at 281.) She further noted that costovertebral angle percussion produced pain in the lower back.

(R. at 281.)  Morangello exhibited no tenderness along the spine, with pain more in the lumbar musculature.  (R. at 281.)  Deeds diagnosed recurrence of episodic low back pain and asthma, currently controlled.  (R. at 281.)  She prescribed Methocarbamol, prednisone and Norco.  (R. at 281.)

Morangello saw Robert S. Spangler, Ed.D., a licensed psychologist, on November 1, 2006, for a psychological evaluation at the request of her attorney.  (R. at 286-92.)  Spangler found Morangello to be socially confident, but depressed, and he found that she demonstrated erratic concentration secondary to depression and discomfort.  (R. at 286.)  She was appropriately persistent on the tasks, but her pace was impacted by erratic concentration.  (R. at 286.)  Morangello noted that her depressive symptoms began in 1999 after she learned that her estranged husband was living with another woman.  (R. at 287.)  Spangler noted that Morangello was alert and fully oriented with appropriate affect.  (R. at 288.)  Her mood was depressed.  (R. at 288.)  She appeared to be functioning in the low average range of intelligence.  (R. at 288.)  Morangello reported driving her children to school daily, preparing breakfast on the weekends, performing light chores, including doing laundry every other day, grocery shopping weekly, watching television and attending church services "every once in a while."  (R. at 288.)

Spangler administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), on which Morangello achieved a verbal IQ score of 86, a performance IQ score of 85 and a full-scale IQ score of 85, placing her in the low average range of intelligence. (R. at 289.)  However, Spangler deemed the performance IQ score and the full-scale IQ score invalid as underestimates of Morangello's abilities due to erratic concentration, intratest scatter, slow pace and discomfort. (R. at 289.) Spangler

-20-

also administered the Wide Range Achievement Test-Third Edition, ("WRAT-3"), the results of which were consistent with the WAIS-III. (R. at 289.) Spangler noted that Morangello's reading achievement was at the fifth-grade level and her arithmetic achievement was at the seventh-grade level. (R. at 289.) The Bender Visual Motor Gestalt Test was administered, the results of which did not indicate the presence of organicity. (R. at 289.) Spangler diagnosed Morangello with depressive disorder, not otherwise specified, mild to moderate, low average intelligence, erratic concentration, mild to moderate, and a then-current GAF score of 55 to 60.[13]  (R. at 290.)

Spangler also completed a mental assessment of ability to do work-related activities, indicating that Morangello had a good ability to follow work rules, to use judgment, to function independently, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 293-95.) He found that she had between a good and a fair ability to relate to co-workers, to deal with the public, to interact with supervisors, to maintain attention and concentration, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 293-94.) Spangler further found that Morangello had a fair ability to deal with work stresses, to understand, remember and carry out detailed, but not complex, job instructions and to demonstrate reliability and a poor or no ability to understand, remember and carry out complex job instructions. (R. at 293-94.) Spangler noted that all of Morangello's work-related mental activities were impacted when depression was at moderate levels, especially her reliability. (R. at 295.) He opined that Morangello's impairments would cause her to be absent from work approximately one day per month. (R. at 295.)

_____

[13]A GAF score of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..."  DSM-IV at 32.

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 31, 2007, the ALJ denied Morangello's claims. (R. at 16-23.) The ALJ found that the medical evidence established that Morangello had

-22-

severe impairments, namely right knee pain status post arthroscopic knee surgery, asthma, a depressive disorder and an anxiety disorder, but he found that Morangello's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19, 22.)  The ALJ also found that Morangello retained the functional capacity to perform simple, low-stress light work that did not require working with the public or exposure to respiratory irritants. (R. at 23.)  Thus, the ALJ found that Morangello could not perform her past relevant work. (R. at 23.)  Based on Morangello's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Morangello could perform jobs existing in significant numbers in the national economy, including those of a stock clerk, a hand packager, a sorter, an assembler and an inspector. (R. at 23.) Therefore, the ALJ found that Morangello was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 23.)  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

Morangello argues that the ALJ erred by finding that she retained the residual functional capacity to perform simple, low-stress light work that did not require working with the public or exposure to respiratory irritants.  (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-10.) Morangello also argues that the ALJ erred by failing to give full consideration to the findings of psychologist Spangler on her ability to perform work-related mental activities.  (Plaintiff's Brief at 10-12.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Morangello first argues that the ALJ erred by finding that she retained the functional capacity to perform simple, low-stress light work that did not require working with the public or exposure to respiratory irritants. (Plaintiff's Brief at 6-10.) Specifically, Morangello argues that the ALJ erred by failing to impose postural limitations despite the state agency physicians' findings that she could never climb ropes or scaffolds and could occasionally climb ladders, kneel, crouch and crawl. (Plaintiff's Brief at 10.) I note at the outset that the ALJ did not even mention the physical residual functional capacity assessment completed by Dr. Johnson, and thereafter affirmed by Dr. Hartman, both state agency physicians. It is well-settled that the ALJ has a duty to analyze all of the relevant evidence. *See Sterling Smokeless*

-24-

*Coal Co.*, 131 F.3d at 439-40. It also is well-settled that the ALJ must sufficiently explain his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he Commissioner must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). The Fourth Circuit has held that "[t]he courts ... face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Here, because the ALJ failed even to mention the physical residual functional capacity assessment completed by Dr. Johnson, and thereafter affirmed by Dr. Hartman, an assessment that is obviously probative to the Commissioner's and this court's determinations, it is impossible for this court to decide whether substantial evidence supports the ALJ's physical residual functional capacity finding and resulting disability determination. For these reasons, I will remand this case to the ALJ for further consideration consistent with this Memorandum Opinion.

Morangello also argues that the ALJ erred by failing to give full consideration to the findings of psychologist Spangler regarding the severity of her mental impairments and their effect on her ability to work, thereby substituting his views on the severity of her psychiatric impairment for those of a trained professional.

-25-

(Plaintiff's Brief at 10-12.) For the following reasons, I will remand this case to the ALJ for further consideration on this ground as well. In his decision, the ALJ stated that he was rejecting Spangler's opinion because it was inconsistent with other substantial evidence contained in the record and could not be afforded any weight. (R. at 21.) While the ALJ explicitly stated the weight that he was giving this obviously probative evidence – none – he failed to sufficiently explain his findings and rationale for doing so, thereby making it impossible for this court to determine whether his decision regarding the severity of Morangello's mental impairments and their effect on her ability to work is supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, Morangello's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED:     This 1st day of April 2008.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE